1  Anoush Hakimi (SBN 228858)
2  anoush@handslawgroup.com
   Peter Shahriari (SBN 237074)
3  peter@handslawgroup.com
4  **THE LAW OFFICE OF HAKIMI & SHAHRIARI**
   1800 Vine Street
5  Los Angeles, CA 90028
   Telephone: (888) 635-2250
6  Facsimile: (213) 402-2170
7
8  Attorneys for Plaintiff-Relator,
   **RELATOR, LLC**
9

FILED
AUG 17 2022
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

10              **UNITED STATES DISTRICT COURT**
11              **NORTHERN DISTRICT OF CALIFORNIA**

12

13  **UNITED STATES OF AMERICA,**          Case No.

14          Plaintiff,                     **CV22 - 4715**

15  *ex rel.* **RELATOR LLC,** a California    **COMPLAINT FOR VIOLATIONS**
    limited liability company,             **OF FEDERAL FALSE CLAIMS**
16                                         **ACT**

17          Relator,                       **FILED *IN CAMERA* UNDER SEAL**
                                           **PURSUANT TO 31 U.S.C. §**
18      v.                                 **3730(b)(2)**

19  **EDDIE LIM,** an individual, **EOIN**
20  **MATTHEWS,** an individual, **POINT**     **DO NOT PLACE ON PACER**
    **DIGITAL FINANCE, INC.,** a Delaware
21  Corporation; and DOES 1-10,

22                                         **JURY TRIAL DEMANDED**
            Defendants.
23

24

25

26      Plaintiff RELATOR LLC (hereinafter referred to as "Plaintiff") complains of

27  **EDDIE LIM,** an individual, **EOIN MATTHEWS,** an individual, **POINT**

28

_____
                        COMPLAINT

**DIGITAL FINANCE, INC.**, a Delaware Corporation; and DOES 1-10:

## I.   INTRODUCTION AND SUMMARY

1.   In this matter two reverse mortgage lenders and their business knowingly took two PPP (Paycheck Protection Program, *hereinafter* "PPP") loans knowing they were <u>prohibited,</u> embezzling millions of dollars in relief money while depriving other eligible businesses and workers of aid. Defendant's took advantage of the "free money". The PPP was meant as a safety net for struggling small businesses and working families. Defendants abused the PPP and used it as a profiteering opportunity. To conceal the exposure of their scheme Defendants changed their company type from lender to "other financial vehicle" in their second loan application. Apart from their ineligibility based on their lending activities, there was no economic need for the loan. Defendant's reverse mortgage business was booming in 2020 and 2021.[1] They did not need any financial assistance from the US taxpayer. *It is shocking that Defendants raised $112,000,000 in capital in 2019 and $115,000,000 in 2021, and yet took from the US taxpayer to pay their 95 employees during this same time.* Defendants then falsified forgiveness documents which were presented to the government to obtain loan forgiveness, billing millions to the US taxpayer and draining the program of aid funds. Now that program is running dry.

---

[1] The Defendant's company is reported to take in $70M per year in revenue. Defendant has also touted $1 billion in new capital in 2021, the same year they took a second PPP loan from the public.

2.      Eddie Lim (*hereinafter* "LIM") and Eoin Matthews (*hereinafter* "MATTHEWS"), used their mortgage lending business, Point Digital Finance, Inc., (*hereinafter* "POINT") to receive two loans for **$3,452,100.00**, purportedly to cover payroll costs, however they:

     a.  Falsified loan eligibility;

     b.  Falsified the economic need for the loans;

     c.  Falsified allowable payroll costs;

     d.  Falsified the use of the loans on authorized expenses;

     e.  Falsified revenue reduction required for a second draw loan; and

     f.  Falsified the need and eligibility for loan forgiveness

3.      <u>Misappropriation.</u> The PPP is and always was intended to help struggling small businesses. Many Americans lost their jobs during the pandemic and many small businesses closed. Some of these because the PPP aid money which could have saved them ran out. Many people are still losing their jobs. Part of the reason is because of those like the Defendants, who bilked the PPP for millions of dollars in aid funds. Simply put, Defendants marauded the PPP, breaking the rules to get as much money as they could, maximizing their embezzlement. It was embezzlement for many reason: Defendant were not allowed to take PPP money. They did not need it. They were not allowed to lie. They were not allowed to take this much and they were not allowed to do it twice. They did

not return it. They used the money on unauthorized expenses. As an added act of corporate greed and misappropriation, they obtained total loan forgiveness, billing millions of dollars to the US taxpayers.

4.     Clear and Obvious Restriction Prohibiting Lenders. POINT and the individual Defendants applied for and received two PPP loans despite knowing they were not allowed. They are in the money lending business and therefore *ineligible* to receive PPP loans.[2] While the vast majority of American industries are allowed to take PPP loans, a very few select industries are specifically not allowed, such as money lenders like Defendants. The rationale for this restriction is that money lenders have readily available money on hand to cover their worker costs. Also, money lenders are not financially suffering as other business types are, for many other reasons. From 2019 to 2021 POINT raised almost $300 million in capital and were a booming business. They only had 95 employees....It is clear that did not need a loan from US taxpayers to pay their employee's wages. They just took advantage of the PPP and used it as a free money piggy bank.

5.     No Economic Necessity and Mortgage-Backed-Securities (MBS). The SBA rules explaining the purpose of the loan are clear: to help struggling businesses pay their workers. POINT raised billions of dollars in capital by its own admission (just in 2021), yet it decided to take money from the US taxpayer purse

---

[2] After receiving the loan POINT did not return the money, but rather obtained loan forgiveness, foisting the cost onto the American taxpayer.

1  to pay its own workers? They did not need the money. Defendants took advantage

2  of the opportunity for what looked like the perfect crime.

3

4      *A decline in revenue* must exist to qualify for loans of this amount. Here

5  there was no decline in revenue. There was no "need" or "economic necessity" to

6  pay Defendant's payroll expenses.[3] POINT did not and cannot show any decline in

7  revenue during the pandemic. In fact, during this time period mortgage lenders

8  experienced record profits throughout their industry. POINT had a banner year. In

9  addition to its growing profits, POINT was receiving funding from private

10 investors. POINT was swimming in money. **In September 2021 POINT**

11

12 **announced it had raised over $1 billion in new capital from real estate and**

13 **mortgage-backed securities investors.** The company website boasted record high

14

15 business achievements. This is not only because housing prices and purchases have

16 dramatically increased since 2020 and continue to increase, but also because of the

17

18 Federal government's policy to purchase Mortgage-Backed-Securities (MBS)

19 which provided mortgage lenders like Defendant a steady source of high income.[4]

20

21 It is very unlikely Defendant suffered any economic downturn. Quite the opposite:

22

23 [3] POINT did not need the loans. They took advantage. POINT is not a small business in
   dire financial straits, but rather a well-financed finance company which was enjoying
24 higher profits. Public information shows their revenue was not declining, and their own
   statements indicate massive growth and profits. Defendant cannot show "economic
25 necessity" in needing the loans to continue business operations.
   [4] Agency MBS purchases are issued by the Federal government. The US Federal Reserve
26 has a $1.25 trillion program to purchase mortgages which was restarted on March 15.
   2020 as a result of the COVID-19 crises. The result of this program is provide mortgage
27 lenders with a guaranteed way to sell their mortgage assets. Mortgage lenders like
   Defendant enjoyed record profits during this time and benefited greatly from this
28 program.

Defendants enjoyed a major increase in revenue in 2020 and 2021. Defendants did not need the loan. POINT had a very lucrative year and so did LIM and MATTHEWS. POINT offices remained open and business was actively continuing and increasing in volume and profitability. It was a very lucrative year for POINT and its owners. They had absolutely no need for a PPP loan, let alone for millions. They took advantage of the PPP program and used it as a windfall.

6.    Unauthorized Expenses. PPP funds must only be used on authorized expenses. PPP funds are:

NOT authorized for lenders;

NOT authorized for a business which has no economic need for the loan;

NOT authorized for owner draws or distributions;

NOT authorized for payroll costs of in excess of $100,000; and

NOT authorized for businesses or individuals who fraudulently submit applications and supporting documents

POINT and its two CEOs and individual Defendants broke all these rules.

7.    Restriction for Lending Industry. POINT was ineligible to receive any SBA loans whatsoever. They are not just a "loan company", they actually provide the money to the consumer taking the loan. They are a *direct* lender, a reverse mortgage provider. The SBA rules are clear: While almost every industry type is allowed to take PPP loans, a very few select number of industries are specifically not permitted, including mortgage lenders like POINT. The reason is that large cash

COMPLAINT

rich money lenders have the ready money available to pay their own payroll expenses and should not take away money from small businesses which do not have ready access to liquid funds. Defendant's industry type make them ineligible for PPP loans because they are **money lenders**.[5] Therefore, Defendant's certification was <u>false</u> because they **are the type of business/industry which is prohibited from SBA loans**. POINT is a lender that provides money loans to consumers, for reverse mortgages.

        8.    <u>NAICS Code 522292 Admission.</u> On its application, Defendant admits to its business function as a *lender* by reporting its industry type with the NAICS code 522292, which is for banks, lending and finance companies. Despite all this, the company falsely reported to the SBA that it was permitted to take the loans even though SBA has clear rules prohibiting loans to lenders.

        9.    <u>Defendant Changes NAICS Code for Second Draw.</u>

      Perhaps realizing the exposure of their scheme, Defendants changed their NAICS Code from 522292 to 525990, for "Other Financial Vehicles" instead of "**Consumer Lending**", which originally reported by POINT as their business type. The second code of 525990 is generic, a less precise description. *An inaccurate and intentionally misleading characterization*. Defendants were trying to deceive. POINT did not change their company activities in the few months between loans.

---

[5] POINT is a lender, reverse mortgages specifically. They specialize in home mortgage loans and have Lender Licenses in many states.

They wanted to hide their true function by the time of the second draw. This attempt at obfuscation may also explain why they changed banks from Blue Ridge Bank, National Association to Loan Source Incorporated for their second draw loan.

10.    Defendants Knew Their Loan Applications Were Obviously Illegal. Defendants falsified their eligible business expenses on their loan application as well as the forgiveness application. POINT is a sophisticated company with extensive history in the lending industry. They knew full well lenders are not eligible to receive SBA 7(a) loans or PPP loans, nor were they eligible for loan forgiveness. Defendants intentionally ripped off a government aid program, needed by working families to survive.

11.    Money Not Returned. The loans were taken by a business which was not allowed to take even one penny in loans, let alone millions of dollars. The **$3,452,100.00** in aid funds should have been returned immediately. These loans should never have been sought in the first place.

12.    2nd Draw PPP False Claims. Defendants audaciously broke even more SBA rules when they sought out and obtained a second round PPP loan. The Defendants were not eligible to receive the first draw, and the second draw PPP loan for additional reasons: Defendant falsified its application when it claimed a loss of 25% revenue in 2020 as compared to 2019, which is required for the second

draw loan. Defendant also falsified its application for the second draw loan when it attested that all of the 1st draw PPP loan proceeds were spent on authorized expenses only. Assuming company owners did not line their own pockets with the PPP loan, the initial loan was not permissible: not one dollar *could* have been spent on authorized purposes because payroll expenses for lenders are not authorized. Also, there was no decline in revenue, as required.

This is not to mention on the second draw they falsified their NAICS Code in an effort to avoid being classified as a mortgage lender.

13. <u>Further Falsification on Loan Forgiveness.</u> Defendants falsified further documents in order to receive loan forgiveness, foisting the costs on the American taxpayer while depriving small businesses and their employees funding to stay open and working. Defendants had to attest as to the use of the funds and the amount used on authorized purposes. They lied on these documents and application also in order to receive partial forgiveness.

14. <u>Defendants' False Statements and Fraud.</u> Defendants knowingly and intentionally made many material false statements to the government and bank to obtain the loans.

15. Defendants did in fact receive the loans. *The Defendants have not returned the loan proceeds*.

16. Defendant used the loan for unauthorized purposes.

COMPLAINT

17.     Defendants then sought and obtained partial loan forgiveness. They could not have complied with the requirements of forgiveness given their business type, assuming the CEOs did not simply pocket the money.

18.     Defendants' communication of false statements constitutes Wire Fraud pursuant to 18 U.S.C. Section 1343, which occurred when Defendants used "the wires" (this includes using the internet or the phone) to steal money by making false statements or promises.

19.     Defendants' communication of false statements also constitutes Bank Fraud (18 U.S.C. Section 1344) – by making false statements to a bank or other financial institution.

20.     Defendants communicated in writing, deceptive statements, including without limitation, with respect to the eligibility of the company obtaining the loans, economic necessity of the loan, the intended purpose of the loan, and the actual use of the proceeds, among others.

21.     Plaintiff-Relator, Relator LLC on behalf of the United States of America brings this action to recover treble damages, civil penalties, and costs under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33, and to recover damages and other monetary relief under the common law and equitable theories of unjust enrichment and payment by mistake.

22.     This action arises from numerous false statements and claims that the

Defendant knowingly presented to the United States and the United States Small Business Administration ("SBA") and lenders acting on the SBA's behalf, in violation of the FCA and common law.

23.    The Defendants unlawfully obtained millions of dollars of PPP Proceeds (as defined below), and failed to return or repay the money. In fact, they went further and obtained total loan forgiveness. The US taxpayer unfairly subsidized their profitable business, while deserving small businesses found they could not longer get loans because of businesses like POINT which drained the program.

24.    In summary, Defendants used the pandemic to obtain millions of dollars from the government. They deceptively completed the SBA loan applications by seeking money for a business which they knew is INELIGIBLE to receive even 1 dollar of PPP loans, because it itself is a lender. The industry in which Defendant belongs is expressly *prohibited* from receiving SBA loans generally and the PPP loan as well. Defendants did not need the loans. They have ample reservoirs of cash on hand, more than enough to pay their workers and rent. Defendants' stock in trade is money. Not only was the loan impermissible, but they obtained forgiveness. The loans were only made because the government and SBA relied on the many false statements made by Defendants. Defendants knew full well that they were making many false statements to the government and SBA. They

knew full well that their active pursuit in seeking out this money was illegal, but they persisted and kept the money.

## II.    THE PARTIES

25.    Plaintiff-Relator LLC, is a California limited liability company with its principal place of business in Los Angeles, California.

26.    Defendant Eddie Lim, is an individual and, at all relevant times herein, is and was the Chief Executive Officer, co-director and co-founder of Point Digital Finance, Inc.

27.    Defendant Eoin Matthews, is an individual and, at all relevant times herein, is and was the co-director and co-founder of Point Digital Finance, Inc.

28.    Defendant Point Digital Finance, Inc. is a Delaware Corporation formed on August 11, 2014 with its principal place of 444 High Street, Floor 4, Palo Alto, California 94301.

29.    POINT is a money lender which directly provides money loans to people in return for an ownership interest in their homes.

30.    During round 1 of the paycheck protection program, Defendants applied for a PPP loan for **$1,452,100.00.** It was approved on April 30, 2020 by the SBA for the full amount, which was disbursed. The loan was facilitated by Blue Ridge Bank. Defendant received 100% of the approved amount. On its application for this loan, Defendant stated that it had 98 employees for which it needed the loan.

31.    During round 2 of the paycheck protection program, Defendants applied for a PPP loan for **$2,000,000.00.** It was approved on May 21, 2021 by the SBA for the full amount, which was disbursed. The loan was facilitated by Loan Source Incorporated. Defendant received 100% of the approved amount. On its application for this loan, Defendant stated that it had 95 employees for which it needed the loan.

### The CARES Act and Paycheck Protection Program

32.    On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security Act ("the CARES Act" or "the Act") (Pub. L. 116-136) became law and provided emergency assistance and health care response for individuals, families, and businesses affected by the coronavirus pandemic. SBA received funding and authority through the Act to modify existing loan programs and establish a new loan program to assist small businesses nationwide adversely impacted by the COVID-19 emergency.

33.    The CARES Act authorized loans to eligible small businesses struggling to pay employees and other business expenses as a result of the devastating effect of the COVID-19 pandemic.

34.    Section 1102 of the CARES Act temporarily permitted the SBA to guarantee 100 percent of 7(a) loans under a new program titled the "Paycheck Protection Program" ("PPP").

35.    On April 24, 2020, the Paycheck Protection Program and Health Care Enhancement Act (Pub. L. 116-139) became law and provided additional funding and authority for the PPP. On June 5, 2020, the Paycheck Protection Program Flexibility Act of 2020 (Flexibility Act) (Pub. L. 116-142) became law and changed key provisions of the Paycheck Protection Program, including provisions relating to the maturity of PPP loans, the deferral of PPP loan payments, and the forgiveness of PPP loans.

36.    Under the PPP, in 2020, eligible businesses could obtain one SBA guaranteed PPP loan. Businesses were required to spend loan proceeds for employee compensation, rent or mortgage, and other specified expenses and, depending on their use of the loan proceeds, could qualify for loan forgiveness, up to the full amount of the loan.

37.    The SBA delegated authority to third-party lenders to underwrite and approve the PPP loans. In order to obtain a PPP loan, a qualifying business (through its authorized representative) signed and submitted a PPP loan application (SBA Form 2483) online through the lender's application platform. The PPP loan application (SBA Form 2483) required the business (through its authorized representative) to acknowledge the PPP program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan.

38.    Once the Borrower submitted its PPP loan application (SBA Form

2483) to a Lender, the participating lender processed the PPP loan application. If a PPP loan application (SBA Form 2483) was approved by the participating lender, it thereafter funded the PPP loan using its own monies, which were 100% guaranteed by the SBA.

39.    After the Lender processed and approved a borrower's PPP loan application (Form 2483), but prior to the closing of the PPP loan, the Lender submitted to the SBA, the Lender's Application - Paycheck Protection Program Loan Guaranty (SBA Form 2484) to the SBA applying for a guarantee on the loan. For a PPP loan to be approved, the Lender was required to Answer Yes to the following questions in the Lender's Application - Paycheck Protection Program Loan Guaranty (SBA Form 2484) as to the Borrower's certification of its General Eligibility to receive a PPP Loan:

| | ☐ Yes | ☐ No |
|---|---|---|
| • The Applicant has certified to the Lender that (1) it was in operation on February 15, 2020, has not permanently closed, and was either an eligible self-employed individual, independent contractor, or sole proprietorship with no employees or had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099MISC; (2) current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant; (3) the funds will be used to retain workers and maintain payroll, or make payments for mortgage interest, rent, utilities, covered operations expenditures, covered property damage costs, covered supplier costs, and covered worker protection expenditures; and (4) the Applicant has | | |

| | | |
|---|---|---|
| not and will not receive another loan under the Paycheck Protection Program, section 7(a)(36) of the Small Business Act (15 U.S.C. 636(a)(36)) (this does not include Paycheck Protection Program second draw loans, section 7(a)(37) of the Small Business Act (15 U.S.C. 636(a)(37)). | | |

SBA Form 2484 (emphasis added). Therefore, if a PPP borrower lied on its PPP loan application (SBA Form 2483), the PPP borrower's false certification caused the Lender to submit to the SBA with respect to that PPP Loan, a Lender's Application - Paycheck Protection Program Loan Guaranty (SBA Form 2484) that contained the PPP borrower's False Statement.

40.    SBA Form 2483 provides the following certification, among others  "I have read the statements included in this form, including the Statements Required by Law and Executive Orders, and I understand them" (hereafter the "Understanding Certification").

41.    SBA Form 2483 provides the following certification, among others "The Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by the Small Business Administration (SBA) implementing the Paycheck Protection Program under Division A, Title I of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (the Paycheck Protection Program Rule)" (hereafter the "Eligibility Certification").

42.    SBA Form 2483 provides the following certification, among others "All SBA loan proceeds will be used only for business-related purposes as specified in the loan application and consistent with the Paycheck Protection Program Rule" (hereafter the "Use of Proceeds Certification")

43.    SBA Form 2483 additionally provides the following certification, among others: "Current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant" (hereafter the "Economic Necessity Certification").

44.    SBA Form 2483 additionally provides the following certification, among others: "The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud" (hereafter the "Worker Retention and Payroll Certification.")

45.    SBA Form 2483 additionally provides the following certification, among others: "During the period beginning on February 15, 2020 and ending on December 31, 2020, the Applicant has not and will not receive another loan under the Paycheck Protection Program." (hereafter the "Single Loan Certification.")

46.    SBA Form 2483 additionally provides the following certification,

COMPLAINT

among others: "I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000" (hereafter the "No False Statements Certification").

47.    After the borrower submitted the PPP loan application, that application was then processed by a participating lender. If a PPP loan application was approved, the participating lender funded the loan using its own monies, which were then guaranteed by the SBA. Generally, in the event that the borrower defaulted on a PPP loan, the SBA would purchase the borrower's debt from the lending financial institution and take on the responsibility for paying back the loan.

48.    Under the applicable PPP rules and guidance, recipients of PPP loans could apply to have the interest and principal on the PPP loan fully forgiven, meaning that the borrower would owe nothing and would have no obligation to repay the PPP loan. To obtain full forgiveness of the PPP loan, borrowers had to

attest that they had "not reduced the number of employees or the average paid hours of [their] employees" during the loan period, that the loan proceeds had been spent on payroll costs and other permitted expenses and that at least 60% of the loan proceeds had been spent on payroll costs (hereafter the "Loan Forgiveness Certification").

49.    Loans could only be used for certain permitted expenses, such as to fund payroll costs and employee benefits, such as health insurance, to pay for, mortgage interest, rent, utilities or worker protection costs related to COVID19.

50.    13 CFR§ 120.110 provides a list of what type of business are INELIGIBLE for SBA loans. This list includes lenders like Defendant …

**"(b) Financial businesses primarily engaged in the business of lending, such as banks, finance companies, and factors (pawn shops, although engaged in lending, may qualify in some circumstances)"**

51.    On April 2, 2020, the SBA posted the First PPP Interim Final Rule announcing the implementation of the CARES Act. SBA posted additional interim final rules on April 3, 2020, and April 14, 2020. On April 28, 2020, SBA posted an interim final rule supplementing the previously posted interim final rules with additional guidance. See, Federal Register / Vol. 85, No. 82 / Tuesday, April 28, 2020 / Rules and Regulations at, 23450-52, available at

https://home.treasury.gov/system/files/136/Interim-Final-Rule-on-Requirements-

for-Promissory-Notes-Authorizations-Affiliation-and-Eligibility.POINT. This interim final rule supplemented previous regulations and guidance on several important, discrete issues. The April 28, 2020, Interim Final Rule was immediately effective without advance notice and public comment because section 1114 of the CARES Act authorized SBA to issue regulations to implement Title I of the CARES Act without regard to notice requirements. *Id.*

52.    With respect to the PPP, the January 6, 2021, Interim Final Rule provided Clarification Regarding Eligible Businesses, specifically 13 CFR Parts 113, 120 and 121.

> *"Are businesses that are generally ineligible for 7(a) loans under 13 CFR 120.110 eligible for a PPP loan?*
> **Paragraphs (a), (g), and (k), of 13 C.F.R. 120.110 do not apply to PPP loans. For PPP loans, the ineligibility restriction in 13 C.F.R. 120.110(n) is superseded by subsection B.2.a.iii. of this interim final rule. Otherwise, a business is not eligible for a PPP loan if it is a type of business concern (or would be, if the entity were a business concern) described in 13 C.F.R. 120.110, except as permitted by subsections B.1.d and B.1.g of this rule or otherwise permitted by PPP rules. Businesses that are not generally eligible for a 7(a) loan under 13 C.F.R. 120.110 are described further in SBA's Standard Operating Procedure (SOP) 50 10 6, Part 2, Section A, Chapter**

53.    The SBA's Standard Operating Procedure (SOP) 50 10 6, Part 2, Section A,

1 Chapter states as follows:

2

3 **CHAPTER 3: INELIGIBLE BUSINESSES**

**A. TYPES OF INELIGIBLE BUSINESSES**

4 The SBA Lender must determine whether the Applicant is one of the types of businesses listed as ineligible in SBA regulations (13 CFR § 120.110). Certain business types appearing on this list
5 may be eligible under limited circumstances, as discussed below.

6     1.  Businesses organized as non-profit businesses are ineligible (for-profit subsidiaries may be eligible). 13 CFR 120.110 (a)

7     2.  Businesses Engaged in Lending 13 CFR § 120.110 (b).

8         a.  SBA cannot guarantee a loan that provides funds to businesses primarily engaged in lending, investment, or to an otherwise eligible business engaged in financing, factoring, or investment not related or essential to the business. This prohibits
9         SBA Loans to:

10             i.   Banks;

             ii.  Life Insurance Companies (but not independent agents);

11             iii. Finance Companies;

12             iv.  Factoring Companies;

             v.   Investment Companies;

13             vi.  Bail Bond Companies; and

             vii. Other businesses whose stock in trade is money.

14         b.  The limited circumstances under which certain businesses engaged in lending may be eligible are as follows:

15             i.   A pawn shop that provides financing is eligible if more than 50% of its revenue for the previous year was from the sale of merchandise rather than
16                  from interest on loans.

17             ii.  A business that provides financing in the regular course of its business (such as a business that finances credit sales) is eligible, provided less than 50% of its revenue is from financing its sales.

18             iii. A mortgage servicing company that disburses loans and sells them within 14
19                  calendar days of loan closing is eligible. Mortgage companies primarily engaged in the business of servicing loans are eligible. Mortgage companies that make loans and hold them in their portfolio are not eligible.

20             iv.  A check cashing business is eligible if it receives more than 50% of its revenue from the service of cashing checks.

21

22

23

24

25     54.    POINT is a lender. They are expressly prohibited from receiving SBA
26
27 loans, including PPP loans. POINT's CEOs, LIM and MATTHEWS are

28

sophisticated businessmen and are not new to the lending world. They knew about the restrictions full well. The legal and financial experts they have hired over the years, would have known this. They intentionally broke these clear rules knowing full well what they were doing.

55.    Defendant's certification was false because **they _are_ the type of business/industry which is _prohibited_ from SBA loans**: **The Defendants are lenders**.

56.    In addition to applying any applicable business type ineligibility rules, all borrowers should carefully review the required certification on the Paycheck Protection Program Borrower Application Form (SBA Form 2483) stating that ''[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant.''

57.    POINT is an obviously successful money lending business. It took advantage of every aspect of the PPP program, from maximizing the amount of the loan and then loan forgiveness. The Co-CEO's are seasoned and cunning businesspersons, well versed in the laws regulating the lending industry. Discovery will reveal where the millions in PPP funds were actually spent, but what is obvious is that Defendants _did not need any money from US taxpayers_. Their business was lending other people money. Public sources report that POINT is and was highly profitable, during the pandemic, just like most in their industry. POINT did not

suffer any business loss and certainly had the money to pay their own worker wages. Their "stock in trade" is money and business was booming. Defendants simply ripped off the PPP program and had the US taxpayers subsidize their business, at best, subsidize their executive's luxury life styles, at worst.

### III.    Defendants' False Statements and Misuse of Proceeds

58.    Defendants applied for and received the PPP Loans in the total amount of **$3,452,100.00**. In order to receive the loans, Defendants would have to have completed SBA Form 2483 entitled "Borrower Application Form". In doing so, Defendants intentionally made materially false statements with respect to the Eligibility Certification, the Use of Proceeds Certification, the Economic Necessity Certification, the Worker Retention and Payroll Certification, the No False Statements Certification and the Single Loan Certification.

59.    Defendants signed the loan applications, thereby endorsing the Understanding Certification, which means that they agreed that they understood the rules and guidelines of the PPP, including, without limitation the rules regarding use of proceeds and the certifications made.

60.    The proceeds of the PPP Loans were not and could not have been used only for authorized purposes consistent with the Paycheck Protection Program Rule, because, among other things, the Defendant was obviously not allowed to take PPP loans because of their industry type - money lenders. Therefore when Defendants made the Use of Proceeds Certification, the certification was false.

COMPLAINT

61.     The proceeds of the PPP Loans were not necessary to support the ongoing operations of POINT. The company's website boasts record high business achievements in 2020. It is no secret that mortgage lenders, like the Defendants' made record amounts of profit during 2020 and 2021. This company had considerable financial resources to pay its own business costs, assuming that is where the money was spent rather than into the pockets of the CEO's. Therefore, when Defendants made the Economic Necessity Certification, the certification was false.

62.     The PPP loan money was only allowed to be used on authorized expenses. The proceeds of the PPP Loan were not permitted to be used to pay business costs for a business in the lending industry, therefore when Defendant made the Worker Retention and Payroll Certification, the certification was false.

63.     The Defendants actively pursued and obtained loan forgiveness. As a mortgage lender, POINT is prohibited from obtaining any PPP loans, therefore any expenditures using PPP loan money was not authorized. In their forgiveness application, Defendant's falsely reported that they spent 100% of the loan proceeds on eligible expenses. Therefore, they lied on this application and certification statements to obtain this forgiveness.

64.     Defendants broke even more SBA rules when they sought out and obtained a second draw PPP loan. The Defendants were not eligible to receive the

COMPLAINT

second round PPP loan because Defendant falsified its application when it claimed a loss of 25% revenue in 2020 as compared to 2019, which is required for the second draw loan. Defendant also falsified its application for the second draw loan when it attested that all of the 1st draw PPP loan proceeds were spent on authorized expenses only.

65.    On their loan applications, Defendant intentionally made many key statements which were obviously false and intended to deceive. These key false statements by Defendant made it possible for them to get the loans and get them written off with forgiveness.

66.    By virtue of the above false statements, when Defendants made the No False Statements Certification, that certification was false.

## IV.    THE FALSE CLAIMS ACT

67.    Plaintiff alleges that, from at least April 30, 2020 through the time of the filing of this Complaint, Defendants violated the FCA by "knowingly" submitting and/or causing the submission of false claims for payment to lenders authorized by the SBA to process PPP loan applications in the form of PPP Applications and the resulting receipt and failure to return PPP loans. These claims for payment were false because Defendants: (1) made knowingly false statements and certifications in their PPP applications, and in certifications accompanying its receipt of federal PPP funds, that it was complying with, and would continue to comply with, applicable laws and regulations governing the award of PPP loans; and/or (2) made, or caused to be made, false representations in loan applications that the Defendants were eligible to receive such PPP loans. Moreover, Defendants'

false claims caused the bank that their used to facilitate the loan on numerous occasions submit to the SBA, a Lender's Application - Paycheck Protection Program Loan Guaranty (SBA Form 2484) that contained Defendants' false statement concerning Defendants' general eligibility for the PPP loans, on which the SBA relied and paid to the lenders. The bank relied on these false statements and passed them along to the government.

68.    The False Claims Act prohibits fraudulent conduct in connection with federal programs, including the knowing submission of false claims for payment to the government. See 31 U.S.C. § 3729(a)(1)(A). In these circumstances, liability may attach if the omission renders those representations misleading. 41. 31 U.S.C. § 3729(a)(1)(A) and (B) of the FCA provide that:

(1) . . . any person who—

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim,

. . .

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government . . .

31 U.S.C. § 3729(a)(1)(A), (B), and (G) (2020).

42. The scope of a false or fraudulent claim is to be broadly construed. As used in the FCA, a "claim"

(A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—

(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—
(I) provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; . . .

31 U.S.C. § 3729(b)(2) (2020).

69.    A person who violates the False Claims Act during the time period at issue "is liable for a civil penalty as adjusted, plus 3 times the amount of damages which the United States Government sustains because of the act of that person." 31 U.S.C. § 3729(a). See 28 C.F.R. § 85.3(a)(9); Department of Justice, 28 CFR Part 85, Civil Monetary Penalties Inflation Adjustments for 2022 published at: https://www.govinfo.gov/content/pkg/FR-2022-05-09/POINT/2022-09928.POINT.

## V.    JURISDICTION & VENUE

70.    This Court has subject matter jurisdiction over the Plaintiff's claims brought under the FCA, 31 U.S.C. §§ 3279, et seq., pursuant to 31 U.S.C. §§ 3730 and 3732. This Court has supplemental jurisdiction to entertain the common law and equitable causes of action under 28 U.S.C. § 1367(a).

71.    Plaintiff The United States of America is also located in the Northern District of California. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because at all times material hereto, Defendants transacted business and are located in the Northern District of California, and acts proscribed by 31 U.S.C. § 3729 occurred in this district.[6]

72.    Venue is proper in this district pursuant to 31 U.S.C. § 3732(a), and under 28 U.S.C. §§ 1391(b) and 1395(a), because the Defendant's acts that form the basis of this Complaint occurred in the Northern District of California.

73.    Relator's claims and this Complaint are not based upon prior public disclosures of allegations or transactions in a federal criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other federal report, hearing, audit, or investigation; or from the news media. To the extent that there has been a public disclosure unknown to Relator, it is the "original source" within the meaning of 31 U.S.C. § 3730(e)(4)(B) and/or the public disclosure is a result of Relator voluntarily providing this information to the United States Government prior to filing this *qui tam* action.

## VI.    FIRST CAUSE OF ACTION

### FALSE OR FRAUDULENT CLAIMS (31 U.S.C. § 3729.(a)(1)(A-B))

---

[6]POINT operates in California and is headquartered in California, within the Northern District. POINT was formed in California and transacts business in California.

74.     Plaintiff alleges and incorporates by reference each and every allegation contained in all prior paragraphs of this complaint.

75.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq*., as amended.

76.     By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, to an officer or employee of the United States government, false or fraudulent claims for payment or approval, in violation of the FCA, 31 U.S.C. § 3729(a)(l)(A).

77.     By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false or fraudulent records or statements material to false or fraudulent claims for payment by the Government.

78.     Because of the Defendants' acts, the United States sustained damages in an amount to be determined at trial and, therefore, is entitled to treble damages under the FCA, plus civil penalties of not less than $12,537.00 and not more than $25,076.00 for each and every violation arising from Defendants' unlawful conduct alleged herein.

## VII.   CONCLUSION

79.     The Defendants abused the PPP. The PPP is and always was meant for small businesses who need help, not cunning millionaires looking for free money. The PPP was meant to give small businesses and working Americans a fighting

chance. The PPP was not meant as a fast grift for well-heeled CEOs to have the US taxpayers give them free millions. The defendants defrauded the Federal government and US taxpayers, misappropriating millions of dollars intended to help needful working Americans at a time of crises. Now that program is dry. The American people have a right to be angry.

## **PRAYER FOR RELIEF**

WHEREFORE, *qui tam* Plaintiff/Relator prays for judgment against Defendants, as follows:

1.  That this Court enter judgment against each Defendant in an amount equal to three times the damages that the United States has sustained because of Defendants' action, plus a civil penalty of not less than $12,537.00 and not more than $25,076.00 for each and every false claim as are required by law, together with all such further relief as may be just and proper.

2.  Such other relief as this Court may deem just and proper, together with interest and costs of this action.

3.  Reasonable attorney fees, litigation expenses, and costs of suit.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: August 10, 2022                THE LAW OFFICE OF HAKIMI & SHAHRIARI

COMPLAINT

1

2     By:   /s/ Peter Shahriari
             PETER SHAHRIARI, ESQ.
3            Attorney for Plaintiff

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT